# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
January 25, 2005 Session

## STATE OF TENNESSEE v. DAVID HOPKINS PLEMONS, JR.

**Direct Appeal from the Circuit Court for Marshall County**
**No. 15396    Charles Lee, Judge**

————————————

**No. M2004-00460-CCA-R3-CD - Filed February 24, 2005**

————————————

A Marshall County jury convicted the Defendant, David Hopkins Plemons, Jr., of second degree murder, and the trial court sentenced him to nineteen years in prison. On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his conviction because he acted in self-defense when he killed the victim; and (2) the trial court erred when it sentenced him. After thoroughly reviewing the record and the applicable authorities, we affirm the Defendant's conviction and sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES, and JERRY L. SMITH, JJ., joined.

Robert L. Marlow, Shelbyville, Tennessee, for the appellant, David Hopkins Plemons, Jr.

Paul G. Summers, Attorney General and Reporter; Preston Shipp, Assistant Attorney General; W. Michael McCown, District Attorney General; Weakley E. Barnard, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the shooting and killing of the victim, Christopher Land, for which the Defendant was convicted of second degree murder.

### A. Trial

At the Defendant's trial, the following evidence was presented: Donna Land testified that she and the victim were married for ten years preceding his death. She said that she and the victim lived together in their trailer home, and the Defendant lived in a trailer "around the corner." Land testified that she did not meet the Defendant until she moved into the trailer, but the victim was friends with

the Defendant as a teenager when they "fought chickens" together. She stated that, after she and the victim moved into the trailer, the victim and the Defendant started "fighting chickens" again, and the victim began to spend a lot of time with the Defendant. Land said that she left the victim about fourteen months after they moved into the trailer together, and she did not have any further contact with him in the four months before he was killed. She said that she had never been in the Defendant's trailer.

Donna Land testified that the victim had problems maintaining employment, and he had problems because he had been raped in his youth and suffered from manic depression. She explained that the victim previously had a problem with drug abuse and had overcome his drug addiction, but, in the four months prior to her leaving, the victim began to abuse drugs again. She said that the Defendant helped the victim apply for government disability assistance, and the victim began to receive checks for disability the same month that he started abusing drugs again.

On cross examination, Donna Land testified that the victim had a previous problem with alcohol, but he had not consumed alcohol in the three years preceding his death. She admitted that the victim had been violent when he was abusing alcohol. She admitted that, on two prior occasions, the police were called to their home because of an argument between them, and the victim resisted arrest. Land said that, when she moved out of the trailer, she stayed at a women's shelter, but she denied that the shelter was a "battered women's" shelter. She said that the victim hid his cocaine consumption from her, and it was months before she realized that the victim was using cocaine in the Defendant's trailer. She admitted that the victim smoked marijuana in front of her, but she said that he was not violent when under the influence of marijuana.

On redirect examination, Land testified that, when the police were called on these two prior occasions , the victim never hit her. Land stated that these arguments between the victim and her involved primarily arguing, pushing, shoving, slapping, or hair pulling. She said that the victim was not violent toward her, even after he began using drugs. She said that she saw the victim in a parking lot about a month and a half before his death, and he gave her a dozen roses and begged her to come home. She testified that the Defendant drove the victim whenever and wherever he needed to go. On re-cross examination, she admitted that, on one occasion when the police came to their home, Land was handcuffed, leg cuffed, and sprayed with pepper spray because he resisted arrest.

Deputy James Darnell, of the Marshall County Sheriff's Department, testified that, on the morning of September 4, 2002, he went to the victim's trailer in response to a dispatch call about a possible suicide attempt. Deputy Darnell said that, when he arrived at the trailer, he knocked on the door but received no response. He said that he was waiting in his car for Chief Deputy Billy Lamb to arrive when he noticed the victim walking up the road from the direction of the Defendant's trailer. The deputy stated that he approached the victim and inquired about his alleged suicidal intentions. He said that Chief Lamb arrived while he was speaking with the victim and that the victim explained that he did not intend to harm himself, but he "had taken more medication than what he should have . . . because he was mad at his mother . . . ." Deputy Darnell said that the victim agreed to go to the hospital with the paramedics, and the victim did not act violent or confrontational. Deputy Darnell

said that he followed the ambulance that took the victim to the hospital and then left the hospital about thirteen minutes after arriving. The deputy recalled that he returned to the hospital because a nurse notified him that the victim had become "a little unruly," but he explained that the victim had calmed down when he arrived. He said that the victim had only wanted to go outside and smoke a cigarette, and the victim did not display any violent or aggressive behavior. He recalled that the victim used the telephone at the hospital, but he did not hear the victim's entire conversation. Deputy Darnell testified that he drove the victim back to his trailer in the early afternoon, and the victim was not "angry" but "[h]e was upset with his mother . . . ." The deputy recalled that, when he dropped the victim off in his driveway, the victim began walking toward his mailbox, and the deputy drove away. He did not see which direction the victim went from there.

Deputy Darnell testified that a little over fifteen minutes later, he received a dispatch call about a shooting at the Defendant's address. The deputy recalled that dispatch relayed that the Defendant shot the victim with a shotgun. He explained that the Defendant's trailer is within one tenth of a mile of the victim's residence. He said that, when he arrived at the Defendant's trailer, he entered the yard through the gate. He recalled that the victim was dead when he arrived, had a visible gunshot wound on his face, and was lying on the ground with his feet on the steps to the trailer. The deputy said that the Defendant exited the trailer with his hands up, and he handcuffed the Defendant. He testified:

> [The Defendant] told me he was sorry, but he didn't think he had [any] other choice, that Mr. Land had come in his yard, slung his gate open, kicked his grill over, was cussing him and threatening to come in and whip his and his wife's ass[es]. . . . [H]e was trying to get in the house.

He said that the Sheriff, other officers, and a crime scene investigator with the Tennessee Bureau of Investigation ("TBI") also came to the Defendant's trailer.

On cross examination, the deputy testified that, when he was dispatched to the victim's trailer the first time, for the suicide call, the dispatcher told him that the victim might have a gun. He said that, when he arrived, he searched the victim and glanced around the living room of his trailer, but he did not see a gun, and the victim denied having a gun. Deputy Darnell testified that the other two officers that responded to the dispatch call that morning were in route when he arrived, but, once he arrived, he did not feel that he needed "back up." He said that, when he returned to the hospital, the victim was calm and remained calm. He said that he did not hear the victim curse at any time, and, when the victim discussed his mother, he was calm, although "upset." The deputy confirmed that the Defendant's charcoal grill was laying on the ground. He said that the Defendant told him that he told the victim not to come into his house.

On redirect examination, the deputy said that, when he spoke with the victim that morning, the victim told him that, while he was talking with his mother on the phone earlier that morning, he hit the coffee table with a baseball bat.

Norman Dalton, a Captain Detective with the Marshall County Sheriff's Department, testified that he and the sheriff responded to the dispatch call about the shooting at the Defendant's trailer. He said that he and the sheriff arrived and found Deputy Darnell at the scene with the Defendant in handcuffs and the victim lying face-up on the ground, with his feet on the steps. He testified that he entered the trailer and noticed "human teeth, skull fragments scattered on the floor, blood spots on the wall." The officer recalled that a shotgun was standing up against a chair and a shell was lying on the floor. He said that the Defendant's wife, Michelle Plemons, was in the kitchen of the trailer, and, at his request, Plemons came outside the trailer. He said that he interviewed Plemons shortly after she left the trailer, and she was very upset and crying. Captain Dalton testified that, when he arrived, the Defendant told him that "he didn't mean to do it . . . [the victim] threatened to whip m[y] and my wife's ass[es]" and that the victim left threatening messages on the answering machine. The officer recalled that the Defendant told him that he told the victim to not enter the house, but the victim "kept coming." On cross examination, Captain Dalton testified that the Defendant was "a little nervous . . . excited" when the officer arrived and spoke to him. He described the Defendant's wife's condition as "hysterical."

Chief Deputy Lamb testified that he arrived at the Defendant's trailer shortly after Deputy Darnell, and the other officers. He said that, a few minutes after he arrived, the Defendant began knocking on the window from inside a patrol car, trying to get someone's attention. The officer stated that he opened the door of the patrol car, and the Defendant began speaking to him. Lamb recalled that the Defendant asked the officer to "tell his wife he loved her and that he didn't mean to do it." The officer said the Defendant told him that he was asleep inside the trailer when the victim began entering the house, and he told the victim not to come inside, to which the victim responded that he was not afraid of the shotgun. Deputy Lamb said that he then shut the patrol car door and walked away. On cross examination, Deputy Lamb testified that, while at the scene of the crime, he had only one brief conversation with the Defendant, and he did not speak to Michelle Plemons. Deputy Lamb said that the Defendant was "upset" but "calm." He admitted that he did not know what demeanor to expect from someone who just shot another person.

Michelle Plemons, the Defendant's wife, testified that the Defendant is disabled and unemployed. She said that the Defendant raises fighting chickens on the property where their trailer is located, which is, approximately, a four acre tract. Plemons said that she had known the victim for a little over a year, and had never seen or heard the victim threaten her or the Defendant. She recalled that the victim came to their trailer almost every day, usually two or three times a day. She said that the victim and the Defendant were friends, and the victim would spend time at the trailer talking with the Defendant and helping take care of the chickens. She said that she and the Defendant drove the victim wherever and whenever he needed to go anywhere. Plemons testified that the Defendant and the victim were not in business together.

She testified that, the day before the shooting, she went out to run some errands, and, when she returned, the victim was visiting with the Defendant in their trailer. She recalled that, after the mail was delivered, she and the Defendant drove the victim to visit his mother in Franklin. She stated that, while at the victim's mother's house, she overheard the victim call the pharmacy and call his

children. She testified that no one was hostile during the visit. Afterwards, she testified, they went to pick up the victim's prescription for Klonopin, and she, the Defendant, and the victim each took one of the pills. They then drove the victim to cash his disability check at a local market. Next, she recalled, they drove the victim to pick up a prescription for his heartburn medicine. She said that the victim was hungry, so she and the Defendant drove him to another market to purchase barbeque and beer. She could not remember whether the victim purchased a six pack or a twelve pack of beer. She said that the three of them split the food, and the victim and the Defendant drank all but two or three of the beers. She said that, after they ate, the victim wanted to obtain some cocaine, so they all drove to purchase cocaine, but the dealer was not at home. She said that the victim then asked if they could go to Nashville to purchase cocaine, which they did. She recalled that the victim injected some cocaine with a needle while the three were driving home. Plemons said that they all went back to her and the Defendant's trailer where she, the Defendant, and the victim consumed the remainder of the cocaine. She said that the victim offered to pay Plemons and the Defendant $100.00 if they would drive him back to Nashville to purchase more cocaine, and they accepted. Plemons explained that the victim used all but "a little bit" of this second cocaine purchase, and eventually left their trailer at around 4:30 a.m., at which time she and the Defendant went to bed. She testified that it was unusual for the victim to stay as late as he did that night.

Plemons stated that she awoke later that morning to the sound of the victim's voice on the answering machine, "cursing." She said he asked where the Plemonses were and why they were not answering their phone, and he stated that he was at the hospital and needed a ride. She denied that the victim made any threats during this message. She testified that the Defendant called the hospital, identified himself as the victim's brother, and inquired about the victim. Plemons recalled that she and the Defendant then went to make a cup of coffee, and the victim's mother called. She said they did not answer but let the machine record a message. She testified that, thereafter, the victim called and spoke briefly with the Defendant, and the Defendant did not seem upset or angry after this call. After he hung up, the victim called again. She testified that, when the Defendant hung up the phone, he looked "shocked." She denied that her husband was angry or yelling. She admitted that she previously told investigators that the Defendant was "yelling" on this call, and she added that she remembered the Defendant refusing to drive the victim somewhere. She denied that her husband told the victim, "come on." Plemons recalled that her husband was walking past the window and said "there is [the victim]," and then he picked up the 12-gauge shotgun that he kept next to the door. She said that she reached to take the gun away from her husband, but he pulled it out of her grasp. She said that, by this point, the victim was at the front door.

Plemons explained that the trailer has two doors, a storm door and a metal main entry door. She said that the main door has a "twist-type" deadbolt lock. She did not remember whether the door was locked when the victim arrived at the house, but she agreed that the Defendant could have locked the deadbolt instead of picking up the shotgun, with no extra effort or time. She recalled that the victim was yelling for the Defendant to let him inside the trailer and that he was not afraid of the shotgun. She said that she did not remember who opened the main door, but admitted that, in two previous statements to the police, she said that the Defendant opened the interior door. Plemons related that "[the victim] came into the trailer and [the Defendant] shot him." When questioned about

how far "into" the trailer the victim came before he was shot, Plemons stated that she could see his face but was unsure whether one or both of the victim's feet entered the trailer. Explaining further, Plemons stated that the victim was completely inside, with both feet inside the trailer. She said that, after the shot, the victim fell back against the door frame and "slid down" out of the trailer, down the steps. She recalled that she took the gun from her husband and called 911 while she unloaded the shell from the shotgun.

She said that her husband did not speak to the 911 operator. She testified that she did not remember whether the Defendant was in the background screaming and cursing. Plemons stated that the Defendant left the trailer while she was on the phone, but she did not know why or where he went because she was speaking with the 911 operators. She conceded that the Defendant was concerned that the chickens would escape and likely went outside to close the gate that the victim left open.

On cross examination, Plemons testified that neither she nor the Defendant left the trailer in the time between the victim's answering machine message and the shooting. She said she did not know that her husband had already been outside before she awoke. She stated that, when she called 911, both she and the Defendant were upset, and the Defendant was screaming and yelling. Plemons said that she tried to take the gun to protect herself. She said that she was afraid for the Defendant and herself because she did not know what the victim would do, because he had been acting strange. Plemons said that the victim would normally call before he came over, and knock on the door before he entered the trailer. Plemons stated that the Defendant appeared shocked that the victim had come to the trailer. She explained that, when she made her initial statements to the police, she was upset, nervous, and hysterical at times.

On redirect examination, she admitted that she made her initial statements to the police seven hours after the shooting, and had calmed down some. She admitted that she also made statements several months after the shooting, and was no longer "hysterical." She admitted that she tried to take the gun away from the Defendant because she was afraid that the Defendant would shoot the victim. On re-cross examination, Plemons explained that she felt she was more rational than the Defendant and could make a better decision as to how to react to the victim's behavior.

TBI Agent Wayne Wesson testified that he assisted with the crime scene investigation at the Defendant's trailer. He said that he interviewed Michelle Plemons the night of the shooting, and she told him that the main door was locked when the victim arrived. Further, Agent Wesson recounted, Plemons told him that the victim opened the storm door but the Defendant opened the main interior door. He recalled that, when he interviewed her several months later, she told him that she could not remember whether the main door was locked when the victim came over the day of the shooting. He said that she explained that the Defendant had already been outside that morning, and was not sure if he had locked the door when he came back inside. Wesson stated that Plemons never said that the victim had both feet inside the trailer when he was shot. Further, the Agent said, Plemons never said that the reason she tried to take the shotgun was to protect herself, but she told him that she would not have shot the victim unless circumstances had escalated.

Agent Wesson testified that the victim's body was lying at an angle, to the left of steps outside the trailer, face-up, with his feet on the first and second stairs. He said that there was a large quantity of blood on the stairs, and a blood stain running up the victim's left pant leg to his right shoulder. He noted that the back of the victim's shirt was soaked in blood, likely caused by the massive bleeding from the gunshot wound to his face, which "puddl[ed]" under his body. Agent Wesson testified that he determined that the victim had been inside the storm door when the Defendant shot him. He said that, just inside the main interior door of the trailer, he noticed some teeth and other human matter. He recalled that he located one spot of blood about six feet into the trailer, "down the hall to the right." He testified that the evidence and wound indicated that, when the Defendant shot the victim, the gun was in close range to, but not in contact with, the victim's face. Agent Wesson said that a close range shotgun gunshot to the face would cause human matter and blood to go in different directions. He said that, when the body is shot with a shotgun, "the body goes straight down . . . In movies they blow back, go flying across the room. In real life, that does not happen." He testified that he located blood on the inside of the doorjamb. He said that almost all of this blood was "streaming down" from approximately thirty-two inches above the floor, and he concluded that this height is where the blood hit the doorjamb. Based on this evidence, he testified that Michelle Plemons' account of the incident–that the victim fell back against the doorjamb and slid down–was impossible.

Agent Wesson testified that he made a recording of the messages on the Defendant's answering machine. He said that there were several messages from the victim's mother, who was trying to locate the victim, and one message from the victim. The agent testified that the victim's message seemed "more a frustrated friend trying to get a friend to come and get him. It wasn't a threat." Agent Wesson said that he noticed a shotgun, with the breech open, propped up against the couch inside the trailer. The agent identified the shotgun and empty shell cartridge that he found at the scene, and testified that that gun and shell were tested and confirmed to be the cause of the victim's death.

Agent Wesson testified that, approximately an hour and a half after the shooting, he took the Defendant's statement. He said that, during this interview, the Defendant was "excited . . . hyper . . . jump[ing] from one topic to another." The Defendant's statement, which was admitted into evidence read as follows:

> On 9/3/02, I took [the victim] to get his Social Security Check and to get it cashed. I have known him all my life. I have treated him like a brother. I have taken him to doctors all over the place. He ask[ed] me yesterday to get him some cocaine and other stuff [and] drugs. He finally did get some Klonopin. He had a refill at Kroger's, and I didn't know it. Today he called me up and he said that he wanted me to take him to get some dope. I said no that I wasn't going to do it. It made him mad. Before that he had come to my house. I was drinking coffee and it was this morning. He ask[ed] me to go with him to his house to call his mama. My wife was asleep. When he called his mama, he began to yell and told her, "I am going to kill you, you f***in b****." . . . He called Ms. Sparks, the lady that owns the land he lives on. . . . He also

told her that he was going to be the worst hell-raiser there ever was till she threw him off the place. . . . He told her "you f***ing fat b****, I ain't paying no more rent." He yelled at her and carried on. I left him and walked home. A while later [the victim] called me and left a message. He was yelling for me to answer the phone. I was asleep or outside or something. He was raising hell. He called again and was yelling and talking fast. I hung up on him. He called again and said he didn't like me hanging up on him. Then he hung up on me. . . . I was in bed and la[i]d back down after he hung up. . . . The next thing I knew he walked down to my house and opened the front gate. He left the gate open. I always keep that gate closed because of my chickens. I have a shotgun . . . . I keep it by the front door. Sometimes I keep it loaded. When [the victim] got to my house he started beating on the front door. He was yelling, "open the door, you mother f***er . . . I'll show you, you son of a b****." I opened the front door and tried to reason with him. He had the storm door open and was already on the top step. He pushed on the metal door, and I tried to keep it closed. He said, "I ain't afraid of you or that shotgun." When he came inside, I shot him. I shot him back out the door. I had already told him on the phone to leave me alone that I wasn't taking him anywhere else. When he pushed his way inside of my house, I shot him.

Agent Wesson testified that he questioned the Defendant about why he shot the victim, and, as noted on the Defendant's statement, he replied, " I was scared for my life. [the victim] has beat me, stole from me; and I was afraid of him." Further, according to Agent Wesson, the Defendant stated that the victim came to his house every day to help with the chickens, and the victim did not have a weapon when he entered the Plemons' yard. The Defendant told Agent Wesson, however, that he was not looking for a weapon, but the victim had made threats and had beaten him up before. Agent Wesson testified that, when officers found marijuana growing on the Defendant's property behind the trailer, he took a second statement from the Defendant, in which the Defendant admitted that the victim helped him grow marijuana.

On cross-examination, Agent Wesson admitted that he has never seen a human body be shot with a twelve gauge shotgun, but, from his training and experience, the body does not "fly backwards." He said that, based on the location of blood and matter from the "blow back" effect of the shot entering the body, the victim's head must have been in the door, just above where the blood was found inside the door frame. The agent explained that the body, after being shot, would have fallen backwards, and he explained how the exact nature of the body's fall was evident in the blood pattern at the scene as well as blood stains on, and the position of, the victim's body itself. Agent Wesson stated that he did not know exactly what effect falling against the screen door would have had on the victims's movement, but he stated that the victim outweighed the door "quite a bit." He conceded that he is not a ballistics or firearms expert. He testified that the victim must have been "coming in" when the Defendant shot him. On redirect examination, Agent Wesson testified that, during his investigation and interviews with various friends and family, he found no evidence to support the Defendant's contention that he was afraid of the victim.

Detective Samuel Bragg testified that he was responsible for collecting the evidence at the Defendant's trailer, and he was present when Agent Wesson interviewed Plemons. Detective Bragg stated that there was no weapon found in the area around the victim's body and no marks found on the door to suggest that the victim used any item in an attempt to gain entry into the Defendant's trailer. The Detective recalled that he had gone to the victim's trailer the morning of the shooting in response to a dispatch call of a possible suicide attempt. He stated that he saw a baseball bat on the victim's coffee table, but he saw no other weapons. On cross examination, Detective Bragg testified that he was looking for a weapon at the victim's trailer the morning of the shooting because he received information that led him to believe there could be a weapon. He recalled that the victim was "fairly normal . . . excited, maybe a little upset" when he spoke to him that morning. He admitted that the victim was "aggravated" with his mother. He said that the presence of blood on the Defendant indicated that the Defendant was in close proximity to the victim when he shot the victim.

Dr. Jon Gerber testified that he is the medical examiner who conducted the victim's autopsy. He stated that the victim was 72.5 inches tall and weighed 202 pounds. He said that the victim died from a shotgun wound to the face. He testified that his examination of the wound revealed that, when the victim was shot, the shotgun barrel was between one and two feet away from his face. He said that the wound was slightly upward and did not exit the back of the head. Gerber testified that the victim's body had several abrasions and contusions that were consistent with the body falling down the four steps of the Defendant's trailer. On cross examination, Dr. Gerber testified that "blow back" pushes tissue and matter in various directions, and matter going in only one direction would be "highly unlikely." He said that, with the angle of the wound, if someone were crouched over, the gun would have to be held lower than the entrance point of the wound. The doctor affirmed that he conducted toxicology tests in the course of the autopsy, and he reported that he found the presence of an antidepressant. He testified that antidepressants help to control behavior and impulses. Further, he determined the presence of marijuana, cocaine, and cocaine metabolites. He explained that cocaine metabolites are "the breakdown of products of cocaine . . . once it is in the body, the body has time to act on it." He said that the presence of "just cocaine" indicated a recent use of the drug, and he concluded that the victim was under the influence of cocaine when the Defendant shot him.

Don Carmen, a forensic scientist with the TBI, testified as an expert in ballistics. He identified the shotgun in evidence as the gun sent to him by the Marshall County Sheriff's Department for examination. He stated that this type of shotgun has a hammer that must be manually pulled back before the gun can be fired. On cross examination, Carmen testified that the particular type of shot used by the Defendant generally has a muzzle velocity of 1300 feet per second. He said that there was no way to measure with what force a shot would hit an object from two feet away, and he did not know whether the amount of force would be sufficient to knock a human being down. He said that a shot from within two feet would not have a "pattern" but would be a solid hole, measuring about one inch.

Officer Lindsay Cook testified that he was working as a 911 operator and dispatcher the day that the victim was shot, and he received the 911 call from Michelle Plemons. He said that he first spoke to Michelle Plemons, but the Defendant eventually took the phone and spoke with him. He

said that he was familiar with the Defendant's address because he had previously received several calls from that location in approximately a year and a half leading up to the shooting. He denied that any of these previous calls were in regard to the victim threatening or harming the Defendant or Michelle Plemons. He identified the 911 call audio recording, which was played for the jury. He affirmed that, as the tape revealed, the Defendant said that he opened the door for the victim, and further, the Defendant asked whether he could go outside to close the gate and prevent his chickens from escaping.

On cross-examination, Cook admitted that, at the beginning of the call, he asked if the victim's name was Christopher Land, because he knew officers were dispatched to Land's address earlier that same day, and he knew that Land had been taken to the hospital and transported home again. He testified that he had previously received two or three calls from the Defendant's address about attempted suicides by the victim. He stated that he was the person who dispatched the officers after the victim's mother called on the morning of the shooting, concerned that the victim "may be trying to hurt himself, and he might have a gun." On redirect examination, the officer affirmed that he had received several calls from the Defendant's address and that none of these calls were for any assault or threats made by the victim. He testified that, when the Defendant spoke to him after the shooting, the Defendant stated that he had previously told the officer what the Defendant was going to do.

Barbara Land, the victim's mother, stated that she first met the Defendant when he and the victim were friends in high school, and she did not see the Defendant again until approximately eight months before the shooting. She explained that the Defendant and Michelle Plemons had been to her house and would give the victim a ride when necessary, in exchange for around twenty dollars. She said that the Defendant and Michelle Plemons brought the victim to her house in Franklin the day before the shooting and stayed for about an hour. She recalled that she next heard from the victim the morning of the shooting, and she could hear the Defendant in the background during that call. Barbara Land testified that the victim said he was going to "turn [the Defendant] in for growing marijuana." She stated that the victim called because he wanted money to pay his landlord, Mrs. Sparks, and to pay some bills. She said that she knew the victim had received and cashed his government check the day before, because she overheard the victim discussing it at her house, and she told the victim she would not give him any money. She said that she told the victim that she would call Mrs. Sparks and make arrangements for his rent, which she did. She recalled that the victim threatened to burn down the house and called her a "bitch," but he did not threaten to harm her personally. She explained that the victim occasionally lost his temper and "would say things," but he never acted on those threats or assaulted her.

Barbara Land testified that she received a second call from the victim "minutes" after the first call, and could still hear the Defendant in the background. She said the victim was angry because she was going to pay Mariquata Sparks directly and not give him any money. She testified that she received one other call from the victim in which he "said he was just going to kill himself." She recalled that the victim said he had "a gun and pills." Barbara Land denied hearing a "loud noise" during this call. She testified that, when she spoke to Sparks, Sparks conveyed to her that she had

spoken to the victim and the victim had threatened to shoot himself. She said that the victim did not threaten to harm anyone but himself. After these calls, Barbara Land called the sheriff's department to check on the victim, and the sheriff's department notified her that they were taking the victim to the hospital for evaluation. After learning that the victim was released, she said, she called the victim's house and the Defendant's house, but was unable to reach anyone.

On cross-examination, Barbara Land testified that she was surprised to hear that the Defendant shot the victim. She said that she had found marijuana in the victim's bathroom, and the Defendant told her that the Defendant was growing it. She testified that she believed that the victim's doctors had stopped prescribing Klonopin for the victim. She said that the victim was "manic depressive bi-polar" and took a lot of drugs. She affirmed that the victim was often mean when he consumed drugs or alcohol.

Mariquata Sparks testified that she owns the property upon which the victim's trailer is located. Sparks recalled that, when she had contacted the victim on two prior occasions regarding property issues, the victim became "irate" and began cursing, but she denied that the victim ever threatened to harm her. She said that, the morning of the shooting, the victim called her, and he was upset and began cursing her, because he was still angry about a property issue and also that Mrs. Sparks had directed purchase offers on his trailer to his mother. She said that the situation "escalated," and the victim threatened to kill himself, claiming that he had a gun. She said that, after the call, the victim came to her house cursing and said he would "not pay this F rent" to Sparks anymore, and if Sparks tried to force him to pay he would burn down the trailer. On cross-examination, Sparks testified that, the day he was shot, the victim's anger and temper were the worst she had witnessed.

Shannon Richards testified that she is a nurse and was working at the Marshall County hospital when the victim was brought in by the sheriff's department. She testified that the victim was mad about being at the hospital, and he kept trying to pull out his intravenous needle. She recalled that the victim was upset with his mother for calling the ambulance, and he said that he needed to leave because he was supposed to meet with someone who was purchasing his trailer. She said that the victim was not threatening or mean to the hospital staff. Richards said that she took the victim outside for a cigarette at his request. She testified that she called the sheriff's department to return to the hospital because she wanted to prevent the victim from leaving, not because she was afraid of him. She recalled that a man called at some point, identified himself as the victim's brother, and inquired about the victim. She said that the victim told her it was not his brother but his friend, and he spoke on the phone for approximately ten to fifteen minutes. She remembered the victim stating, "I love you man. I love you." during the phone call. She could not remember the name of the man that called the hospital, but she recognized the man's name when she heard that he shot the victim. She said that the victim was happy when he left, and apologized for giving the staff a "hard time." On cross-examination, Richards testified that the victim admitted taking several Klonopin pills, but he denied that he was attempting to overdose. She affirmed that the victim told her he had smoked marijuana and used cocaine. She admitted that the victim was angry with his mother and said his mother was "crazy." She testified that she witnessed the victim go through severe mood changes,

from angry to calm, to angry again.

Sharon Crafton testified that she lives in a trailer in the same area as the victim, and she also rented her property from Sparks. She recalled that she saw the Defendant and the victim together almost every day, either at, or going to, one of the their respective trailers. She testified that she never saw the victim and the Defendant argue.

Robert Crafton testified that he is the Defendant's first cousin and lived about 100 yards away from him. He recalled meeting the victim through the Defendant when he was a teenager and then again when the victim and his wife moved into their trailer. He said that he called the Defendant the morning following the shooting and the Defendant stated, "[w]hat did I tell you I would do to the mother f***er that came down here f***ing with me." Crafton said, however, that the Defendant had not told him he would do anything to anyone. Crafton said that the Defendant told him the victim had called asking for a ride from the hospital and "raising cane," and the Defendant hung up on the victim. He recalled that the Defendant told him that the victim called back and threatened to "kick his ass," and the Defendant told the victim to "come on." He said that, according to the Defendant, the victim came over and was trying to take the shotgun away from Plemons, and when the Defendant felt the gun touch the victim's face, he pulled the trigger.

Following this evidence, the trial court instructed the jury on second degree murder and three lesser-included offenses. Additionally, the trial court instructed the jury on the affirmative defenses of self-defense and defense of a third person, stating, in part, as follows:

> When a person is assaulted, by the use of force or attempted use of force, in such a way as to create in his mind a reasonable belief that he is in imminent and actual danger of death or serious bodily injury, he will be justified in using force to defend himself even to the extent of killing another human being. The use of force can only be to the degree reasonably believed to be immediately necessary to protect against the other's use of unlawful force. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds.
>
> . . . .
>
> A person may have been mistaken, based on his perception of the circumstances, as to the extent of the actual danger, but if he acts in self-defense from honest even though mistaken, convictions as to the exten[t] of danger, he will not be held criminally liable for his actions.
>
> . . . .
>
> If evidence is introduced supporting self-defense, the burden is on the state to prove beyond a reasonable doubt that the defendant did not act in self-defense.

-12-

. . . .

A person is justified in threatening or using force against another to protect a third person if:

> (1) under the circumstances as the person reasonably believes them to be, the person would be justified, under the principles which apply to Self-Defense, in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected;

> and

> (2) the person reasonably believes that the intervention is immediately necessary to protect the third person.

> Any person using force intended or likely to cause death or serious bodily injury within his or her own residence is presumed to have held a reasonable fear of imminent peril of death or serious bodily injury to self, family, or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence, and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

Based upon this evidence and the instructions of the trial court, the jury convicted the Defendant of second degree murder.

### B. Sentencing Hearing

At the Defendant's sentencing hearing the trial court found that the following enhancing factors applied: the Defendant had a history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; and the Defendant possessed or employed a firearm during the commission of the offense. Tenn. Code Ann. § 40-35-114(2), (10) (2003). The court stated that it gave little weight to the Defendant's prior convictions, as the prior convictions were of a different nature than the crime in this case, but the court placed considerable weight on the Defendant's manufacture and persistent use of drugs. Further, the court said, it placed little weight on the Defendant's use of a firearm because, the court explained, it is difficult to commit a murder without employing some sort of deadly weapon. Next, the trial court addressed the Tennessee Code Annotated section 40-35-113 mitigating factors and found that the defendant acted under strong provocation and committed the crime "under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct." Tenn. Code. Ann. §40-35-113(2), (11). The trial court then sentenced the Defendant to nineteen years in prison, one year less than the presumptive mid-range sentence of twenty years for this Class A felony conviction. Tenn. Code Ann.

§§ 40-35-112(a)(1), -210(c) (2003).

## II. Analysis

The Defendant appeals his conviction and sentence, contending that: (1) the evidence is insufficient to sustain his conviction for second degree murder; and (2) the trial court erred when it sentenced him.

## A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction because he acted in self-defense. He argues that the State failed to negate this defense beyond a reasonable doubt. The State counters that the evidence is sufficient to sustain the Defendant's conviction, and the question of self-defense was properly considered and rejected by the jury. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Carter, 121 S.W.3d 579, 588 (Tenn. 2003); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). This Court may not substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Second degree murder is defined as "[a] knowing killing of another . . . ." Tenn. Code Ann. § 39-13-210 (2003). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-302(b) (2003). Tennessee's self-defense statute, Tennessee Code Annotated section 39-11-611(a), (b) (2003), provides as follows:

> (a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to

protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

(b) Any person using force intended or likely to cause death or serious bodily injury within the person's own residence is presumed to have held a reasonable fear of imminent peril of death or serious bodily injury to self, family or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence, and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

Additionally, a person is justified in using force to defend a third person if that third person would be justified in using force in his or her own defense, under section 39-11-611, and the person using force "reasonably believes that the intervention is immediately necessary to protect the third person." Tenn. Code Ann. § 39-11-612 (2003). The State has the burden of negating any defense if admissible evidence is introduced supporting the defense. Tenn. Code Ann. § 39-11-201(a)(3) (2003). It is well-settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact. State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). It is within the prerogative of the jury to reject a claim of self-defense. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997).

In the case under submission, the evidence produced at trial showed that the victim and the Defendant were close friends who spent almost every day together, often at the Defendant's trailer. The Defendant's wife testified that the victim was always welcome at their home. The victim threatened to tell the police that the Defendant was growing marijuana. The victim came to the Defendant's trailer unarmed, the Defendant opened the door for the victim, and the Defendant shot him in the face. This evidence, viewed in a light most favorable to the state, is legally sufficient to support the Defendant's conviction for second degree murder. Although the Defendant claims he acted in self-defense, the jury was properly instructed on this issue and it rejected this defense. This issue is without merit.

## B. Sentencing

When a defendant challenges the length or manner of service of a sentence, it is the duty of this Court to conduct a de novo review of the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "'conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001) (quoting State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999)); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal

conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In conducting a de novo review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or statutory enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Cmts.

In the case under submission, we conclude that there is ample evidence that the trial court considered the sentencing principles and all relevant facts and circumstances. Therefore, we review its decision de novo with a presumption of correctness. Accordingly, so long as the trial court complied with the purposes and procedures of the 1989 Sentencing Act and its findings are supported by the factual record, this Court may not disturb this sentence even if we would have preferred a different result. See Tenn. Code Ann. § 40-35-210, Sentencing Comm'n Cmts; State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The United States Supreme Court's recent opinion in Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004), calls into question the continuing validity of our current sentencing scheme. In that case, the Court, applying the rule in Apprendi v. New Jersey, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. 124 S. Ct. at 2537. The Court observed that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." Id. Finally, the Court concluded that "every defendant has a right to insist that the prosecutor prove to a jury [beyond a reasonable doubt] all facts legally essential to the punishment." Id. at 2539.

The Defendant asserts that his sentence is excessive in light of the United States Supreme Court decision in Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004). The State counters that the Defendant's sentence is below the statutory sentence in this case, and, therefore, Blakely is inapplicable. The sentence range for Class A felony, Range I offenders is fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1) (2003). In calculating the sentence for a Class A felony, the presumptive sentence is twenty years, the midpoint of the range, in the absence of enhancement and mitigating factors. Tenn. Code Ann. § 40-35-210(c) (2003). If there are enhancement factors but no mitigating factors, the sentence must be set at or above the midpoint of the range. Tenn. Code Ann. § 40-35-210(d). If there are mitigating factors but no enhancement factors, the trial court must set a sentence at or below the midpoint of the range. Tenn. Code Ann. § 40-35-210(d). If there are both mitigating and enhancement factors, the trial court must adjust the sentence based on the weight it

assigns to each factor.  Tenn. Code Ann. § 40-35-210(d).

In the case under submission, the trial court sentenced the Defendant to nineteen years. Because the presumptive sentence in the Defendant's case is twenty years, the trial court could have sentenced the Defendant to twenty years absent any enhancement or mitigating factors.  Moreover, even if the trial court found mitigating factors and no enhancement factors, the sentence imposed is not outside the trial court's discretion because the Defendant's sentence is nineteen years, which is "at or below the presumptive sentence" of twenty years.  Thus, the trial court did not apply enhancement factors to exceed the "statutory maximum" sentence, and <u>Blakely</u> is not applicable. This issue is without merit.

### III.  Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the Defendant's conviction and sentence.  We remand the case for the entry of appropriate judgments of conviction, consistent with this opinion.

_____
ROBERT W. WEDEMEYER, JUDGE